**UNITED STATES of America, Appellee,**

v.

**Russell M. BLISS, Appellant.**

**No. 83–2194.**

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1984.

Decided May 22, 1984.

Rehearing and Rehearing En Banc Denied June 15, 1984.

Thomas E. Dittmeier, U.S. Atty., St. Louis, Mo., James E. Crowe, Jr., Asst. U.S. Atty., St. Louis, Mo., for appellee.

Shaw, Howlett & Schwartz, Attys. at Law, by Charles M. Shaw, Clayton, Mo., for appellant.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Russell M. Bliss appeals his conviction for filing false income tax returns for the years 1976, 1977, and 1978 (26 U.S.C. § 7206(1)). Bliss principally contends, as grounds for reversal, that the district court* prejudicially erred in refusing to grant him a change of venue; he urges that intensive and inflammatory pretrial publicity surrounding his spraying of dioxin contaminated substances in eastern Missouri made it impossible to impanel a fair and impartial jury there. He additionally claims there was prejudicial preindictment delay and insufficient evidence to support his conviction. We reject all of these claims and affirm Bliss' conviction.

I. *Factual Background*

During the relevant taxable years 1976, 1977, and 1978, and for many years prior, Bliss was the sole proprietor and operator of Bliss Waste Oil Service, a St. Louis business engaged in buying used or "waste" motor oil from gas stations, treating it, and then reselling or reusing it for various purposes. Bliss reported income and expenses for his waste oil service business on a Schedule C, which was attached to his personal income tax returns filed in 1976, 1977, and 1978. The criminal charges against Bliss concerned his overstatement of "purchases" expenses on his Schedule C's for 1976, 1977, and 1978. The government's position was that Bliss willfully overstated his expenditures for waste oil by $23,570.00 in 1976, $27,550.00 in 1977, and $18,100.00 in 1978.[1]

The overstated purchases expenditures were generated by bogus transactions between Bliss and three other individuals. First, in 1976 and 1977, twenty-two checks written on the Bliss Waste Oil Service ac-

count were made payable to variations of the "G–L Oil Co.," a fictitious business entity. The checks were delivered to Gary Lambarth, an employee of Bliss, who cashed them at a local bank and paid Bliss back 90% of the full amount; the 10% retained represented Lambarth's "service commission." For each check, either Bliss or Lambarth prepared an invoice or receipt indicating that the entire amount represented the payment of oil purchases. Bliss provided the receipts or invoices to the IRS as documentation of the purchases expenditures entry on his returns. Lambarth testified that the G–L Oil Co. was a fictitious entity and that Bliss never purchased any oil from him. Lambarth further testified that Bliss characterized the money generated by the transactions as "tax free money."

When Lambarth left Bliss' employ in 1978, Bliss had another young employee of his, Dave Covert, cash four Bliss company checks made payable to "Dave Covert Oil Co.," a fictitious business. Covert, like Lambarth, paid Bliss back all but 10% of the full amount. Again, the full amounts of the checks were claimed by Bliss as expenditures for oil "purchases," purchases that were never in fact made. Both Covert and Lambarth testified that after the IRS investigation began, they were advised by Bliss to tell the IRS that they had sold Bliss the oil as shown on the checks they had cashed.

Finally, in 1977, Bliss purchased a truck from a business acquaintance for $6,000.00, which was paid with a check written on the Bliss company account. On the face of the check, Bliss noted that the payment represented a purchase of 60,000 gallons of oil at 10 cents per gallon. That check comprised part of the oil "purchases" expense on Bliss' Schedule C for 1977. Callahan testified that after the IRS began investigating Bliss, the latter advised Callahan to tell the IRS that the $6,000.00 payment represented a legitimate oil purchase.

---

* The Honorable Clyde S. Cahill, United States District Judge, Eastern District of Missouri.

1. The overstated tax deductions yielded the following underpayments of tax by Bliss: 1976— $12,579.00; 1977—$16,075.00; and 1978—$11,-221.00.

At trial, Bliss admitted the "G–L Oil" and "Dave Covert Oil" checks were cashed as Lambarth and Covert had testified. However, he asserted that the money generated by the checks were used to make cash payments to Larry Gooden, the manager of a barge cleaning business that removed residue liquid cargo—including oil—from barges and stored it in "slop tanks." Bliss testified that in order to purchase the residue, he was required to make "under the table" cash payments to Gooden. Bliss claimed all the money generated by the "G–L Oil" and "Dave Covert Oil" checks went to Gooden; thus, to Bliss' way of thinking, the full amounts of those checks were properly deductible oil purchases expenses. Bliss further explained that the $6,000.00 check to Callahan was for an oil hauling truck, worth only $1,000. Since he "felt" the truck payment should be deductible, he claimed the full amount of the check as an oil purchase.

Larry Gooden testified, under a grant of judicial immunity, that, in 1976, Bliss made four cash payments to him for the slop tank residue, but the total amount of these payments was only $4,000.00, considerably less than the $23,570.00 in checks written by Bliss to "G–L Oil" in that year. Moreover, the cash payments Gooden received in 1977 and 1978 were "brokerage commissions" for Gooden's participation in arranging Bliss' sale of over $180,000.00 in oil to the Kiesel Oil Company. Gooden was "secretly married" to Lorraine Kiesel, the president of Kiesel Oil Co. Gooden testified that the brokerage payments from Bliss amounted to $7,500.00 in 1977, considerably less than the $27,550.00 in checks written that year to "G–L Oil" and Callahan. And, Gooden testified that he received $2,500.00 in cash payments from Bliss in 1978, again far short of $18,100.00 in checks written that year to "G–L Oil" and "Dave Covert Oil." Bliss stopped making brokerage payments to Gooden once he found out about the close relationship between Gooden and Kiesel.

The indictment against Bliss was returned on December 20, 1982. Bliss sought to dismiss because of preindictment delay and requested a change of venue because of prejudicial pretrial publicity concerning his involvement in spraying dioxin contaminated substances in eastern Missouri. The court continued the initial trial setting of January 1, 1983, and reset the case of July 18, 1983. The district court adopted a magistrate's recommended denial of the preindictment delay motion. The court deferred ruling on the motion and supplemental motion for a change of venue until the jury selection process was undertaken. Satisfied that it had impaneled a fair and impartial jury, the court denied the requested change of venue. Bliss was convicted on all three counts after a five-day trial.

## II.   *Change of Venue*

Bliss claims the court abused its discretion in failing to grant his motion for a change of venue, either before or during voir dire, because of prejudicial pretrial publicity. He refers to the widespread publicity surrounding his spraying of dioxin contaminated oil substances in eastern Missouri—specifically, Times Beach, Missouri. Allegedly, the extensive and inflammatory nature of this publicity made it impossible to impanel a fair and impartial jury in the Eastern District of Missouri. As proof of the prejudicial effect of the pretrial publicity, Bliss refers to the fact that all but one of the veniremen admitted they had heard about Bliss' dioxin problems.

First, we do not believe the court abused its discretion by refusing to rule on the transfer motion prior to voir dire. *United States v. Brown*, 540 F.2d 364, 377–78 (8th Cir.1976). "This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue." *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir.1981), *cert. denied, sub. nom., Weigand v. United States*, 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982). Underlying this preference is the recognition that the due process guarantee of trial by a fair and impartial jury can be met even where, as here,

virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity. *See Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *Murphy v. Florida*, 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2035–2036, 44 L.Ed.2d 589 (1975). As the court stated in *Brown*, 540 F.2d at 378:

> Mere exposure to publicity or the formation of tentative impression by some jurors is not enough to require a change of venue. The ultimate test is whether a juror has been exposed to pre-trial publicity and, if so, whether he or she can set aside any impression or opinion resulting from that exposure and render a verdict based solely on the evidence presented at trial.

*Citing Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961); *see also Poludniak*, 657 F.2d at 955.

■ A pretrial venue change is called for only in those situations where the pretrial publicity in a community is so extensive and inflammatory as to raise a presumption that an impartial jury could not be seated there. *See Poludniak*, 657 F.2d at 955; *United States v. McNally*, 485 F.2d 398, 402 (8th Cir.1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). As the Supreme Court recognized in *Beck v, Washington*, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1961), the inquiry is whether the "pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors [regarding their impartiality] and would be compelled to find bias or preformed opinion as a matter of law." In this case, the pretrial publicity was not so extensive, in scope or duration, as to raise a presumption of juror partiality; nor did the voir dire indicate "such hostility to [Bliss] by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy v. Florida*, 421 U.S. 794 at 800, 95 S.Ct. 2031, at 2036; *see also Irvin v. Dowd*, 366 U.S. at 723, 727–28, 81 S.Ct. at 1642, 1645–46.

The adverse pretrial publicity began in December, 1982, when Times Beach was ravaged by the flooding Meramec River. At that time, EPA investigators found traces of dioxin in soil samples in Times Beach, Missouri, triggering massive evacuations. In late December, 1982, and early January, 1983, various Missouri newspapers and both local and national television began reporting Bliss' role in spraying dioxin laced waste oil materials over numerous sites (including roads and horse arenas) in eastern Missouri. The reports indicated that Bliss, while conducting his waste oil business in 1971, was hired to haul away dioxin contaminated waste materials from a chemical processing plant in Verona, Missouri (southeastern Missouri). Bliss, in the course of his business, mixed the dioxin contaminated waste materials with oil and sprayed the mixture on the streets and various horse arenas in eastern Missouri.

Much of the publicity in late January and early February, 1983, concerned the hearings conducted by the Missouri Department of Natural Resources to determine whether to cancel the waste hauling license of Jerry Russell Bliss, Inc., the successor to the defendant Bliss' business. Numerous national and local reports detailed the state's evidence concerning Bliss' spraying of dioxin contaminated materials in 1971. These reports also included Bliss' own forceful testimony before the Department that he was completely unaware that the waste materials he sprayed contained chemicals hazardous to human or animal health. Bliss made a rather emotional appeal that the chemical company in Verona, Missouri, from whom he acquired the dioxin tainted waste, never warned him of the health dangers associated with the application of the waste. Bliss provided similar exculpatory testimony before the Missouri House Energy Committee in early January. This testimony was contained in various Missouri newspaper reports as well as in St. Louis and national television broadcasts. The district court properly noted that Bliss' highly publicized testimony may have evoked a sympathetic response in part of the community.

After the hearings before the Department of Natural Resources concluded in early February, 1983, the media attention—both local and national—turned away from Bliss and towards the EPA's proposals to "buy-out" homeowners in various dioxin plagued sites—specifically the Times Beach area. On February 22, 1983, the EPA announced its $33 million dollar "superfund" buy-out proposal. Widespread local and national publicity ensued. Through most of March and April, 1983, the media reports on dioxin focused almost entirely on the EPA's additional proposals to buy out other sites contaminated by dioxin. Local media also focused on the Missouri legislature's proposal to establish its own "superfund" for buy-outs. From this point on, only occasional and passing reference was made to Bliss in news reports on the dioxin problem. Bliss' motion for a change of venue contained 350 pages of materials reflecting dioxin publicity only up until April 7, 1983.

█ It is fair to say that the bulk of the adverse publicity surrounding Bliss occurred between December, 1982, and February, 1983; after that time frame, Bliss was relegated to a peripheral role in the dioxin-related publicity. And, the publicity concerning Times Beach had substantially abated by April of 1983. The district court acted judiciously in continuing Bliss' trial date to July, 1983, to allow the adverse publicity to subside. By the time of trial in July, there was no indication that the eastern Missouri community was inflammed or corrupted by the publicity of some five months earlier. The earlier publicity concerning Bliss consisted of straightforward, factual, and objective reports, rather than invidious reports tending to arouse lingering ill-will or vindictiveness in the local community. This case is thus clearly distinguishable from *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), where the Court concluded that defendant did not receive a fair and impartial jury in a small, rural community that was, immediately preceding the trial, barraged by highly sensationalized and inflammatory publicity, including reports of defendant's confessions to six murders (including the one for which he was charged).

The voir dire in this case also reveals that the jurors' qualification as to impartiality exceeded the minimum Constitutional standards. Of the fifty-one veniremen who were questioned, eleven were stricken for cause related to opinions regarding Bliss. Only three of those eleven stated that their opinions stemmed from exposure to pretrial publicity. None of the veniremen had any prior knowledge of the criminal tax case against Bliss. Finally, and most critically, not one of the venire group from which the jury was selected admitted to having any opinion or impression about the defendant.

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court rejected defendant's change of venue motion under circumstances at least as threatening to a juror's impartiality as existed here. Virtually all the veniremen in *Murphy* had been exposed to widespread pretrial publicity concerning the defendant's robbery charge at issue and his previous criminal exploits. *Id.* at 800, 95 S.Ct. at 2036. However, the voir dire revealed that twenty of seventy-eight veniremen had formed an opinion on defendant's guilt. The Court in *Murphy* distinguished *Irvin v. Dowd*, where 90% of the veniremen and eight of twelve of the eventual jurors expressed opinions that they believed defendant was guilty. Justice Marshall stated for Court in *Murphy*, 421 U.S. at 803, 95 S.Ct. at 2037:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it. In *Irvin v. Dowd*, for example, the Court noted that 90% of those examined on the point were inclined to believe in the accused's guilt, and the court had excused for this cause 268 of the 430 veniremen.

In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own. *See also Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962) (that fourteen of 52 potential jurors admitted an opinion on defendant's guilt did not raise a presumption of bias). We believe the voir dire in this case similarly failed to raise a presumption of juror partiality that could not be laid aside.

Finally, the trial judge's careful and painstaking jury selection procedures assured that a fair and impartial jury was impaneled. The voir dire questioning on the pretrial publicity was especially penetrating and probing, permitting the court and the parties to ferret out any latent prejudicial opinions or impressions. The veniremen were split into two groups, each of which was separately questioned on pretrial publicity. The first group of veniremen, from which eleven of the twelve jurors were chosen, was repeatedly cautioned against reliance on any pretrial publicity. The court also asked a wide array of questions designed to elicit the existence of opinions and sources of those opinions. The court specifically asked whether the prospective jurors: (1) had any opinion with respect to Bliss' involvement in the dioxin matter or had any "feeling," inclination, or attitude about Bliss; (2) had read more than three newspaper articles on the dioxin matter; (3) had read anything about dioxin within ten days prior to trial; (4) had been personally affected by the dioxin issue as a result of spraying in areas where they lived and frequented; (5) had worked in a waste oil business or had dealt with the dioxin issue in work.

All veniremen falling into one of these five categories were then questioned individually *in camera* by the court and counsel. Those expressing an opinion with regard to Bliss were then stricken for cause. The court then once again met with the remaining veniremen and renewed its request that the veniremen express any impressions or opinions they might have. Following that, the court allowed counsel to question the veniremen on topics other than pretrial publicity. The second group of veniremen, from which the twelfth juror and two alternates were selected, were questioned in the same manner.

This careful questioning of both groups led to the striking of all eleven veniremen who expressed an opinion with respect to Bliss, despite their protestations of impartiality. Of the thirty-two veniremen from whom the jury was ultimately selected, none admitted any opinion or impression about the defendant. The district court thereupon concluded, based upon its own observation of the venire panel and the courtroom atmosphere, that these thirty-two veniremen had no unstated prejudices or opinions that would prevent them from being impartial. Given the extensive and careful voir dire questioning, we are unable to say that the district court's finding of impartiality was erroneous. *Irvin v. Dowd,* 366 U.S. 717, 723–24, 81 S.Ct. 1639, 1642–43; *see also Rosales-Lopez v. United States,* 451 U.S. 182, 188–89, 101 S.Ct. 1629, 1634–35, 68 L.Ed.2d 22 (1981) (trial court accorded wide latitude of discretion in the selection of jurors because demeanor plays an important part in determining impartiality).

III. *Preindictment Delay*

■ Bliss claims the two-and-one-half-year delay between the completion of the IRS investigation, in June, 1980, and the indictment, in December, 1982, violated his due process rights. To establish such a claim, Bliss must demonstrate that the government intentionally delayed seeking an indictment to gain tactical advantage and that the delay substantially prejudiced his defense. *United States v. Lovasco,* 431 U.S. 783, 788–90, 97 S.Ct. 2044, 2047–48, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 322, 324, 92 S.Ct. 455,

464, 465, 30 L.Ed.2d 468 (1971). Bliss brazenly asserts that the government intentionally delayed to exploit the intervening dioxin publicity, resulting in substantial prejudice to his trial defense.

The record simply does not support Bliss' claim. The government's delay between the completion of the agent's report and indictment was justified by numerous investigative measures, including the reviews by the District Counsel of the IRS, the Tax Division of the Department of Justice, and the United States Attorney's Office. During this time, witnesses Lambarth and Covert had to be brought before the Grand Jury. Also, key witness Gooden, whose identity Bliss had concealed from the government, was first approached in the fall of 1981, when he requested immunity. Gooden's immunity request was then processed and his proffered testimony was studied before he was granted immunity on April 8, 1982. Gooden appeared in the Grand Jury in October, 1982, and the indictment was brought two months later. Bliss has made no showing that the government timed the indictment to gain a tactical advantage over him or to exploit the pretrial publicity.

Bliss has also failed to show how his trial defense was substantially prejudiced by the timing of the indictment. He has not claimed that evidence or witnesses became unavailable to him because of the delay. Moreover, as discussed above, Bliss was not deprived of a fair trial because of the pretrial publicity.

IV. *Sufficiency of the Evidence*

Bliss' contention that the evidence was insufficient to support his convictions for filing false tax returns borders on the frivolous. There was overwhelming evidence indicating that Bliss knew the tax returns for the three years in question were false as to material matters—*i.e.*, the purchases expenditures on his Schedule C's. 26 U.S.C. § 7206(1); *United States v. Warden*, 545 F.2d 32, 37 (7th Cir.1976).

In support of his contention, Bliss relies entirely on his own self-serving trial testimony that all of the cash generated by the checks to fictitious entities were paid to Gooden for the purchase of the contents of the slop tanks. But the jury could have properly discredited Bliss' testimony and credited Gooden's testimony that he received amounts far less than the amounts generated by the checks. And, even if part of Bliss' payments to Gooden in 1977 and 1978 were deductible as "brokerage commissions," Bliss falsely misstated those deductions as "purchases" from the fictitious entities "G–L Oil" and "Dave Covert Oil." Bliss also falsely claimed a $6,000 payment for a truck as an oil purchase expense in 1977. It has been recognized that a willful and knowing misstatement as to the source and nature of income on a return is prohibited by § 7206(1), even if the correct amount of income is otherwise fully reported. *United States v. DiVarco*, 484 F.2d 670, 673 (7th Cir.1973), *aff'g*, 343 F.Supp. 101, 103–04 (N.D.Ill.1973), *cert. denied*, 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974). It would appear that the same principle should apply with respect to willful and knowing misstatements as to the source of claimed deductions.

Finally, Bliss' willfulness was established by rather strong evidence showing his efforts to conceal the true nature of the numerous check transactions. *See Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). The checks and check stubs representing purchases from fictitious entities, and the invoices documenting those purchases, were patently false. In fact, many of the invoices were fabricated after the IRS investigation had started. Bliss' awareness of the illegal nature of his check-cashing scheme was vividly revealed by statements to Lambarth that the checks in question generated "tax free money" and that he wrote the checks "to keep our taxes down." Bliss' willfulness was also shown by his efforts to cajole Covert, Lambarth, and Callahan into admitting, falsely, that they had sold him the oil as reflected on the checks. Bliss also went to great lengths to conceal his association with the local bank where the checks written to "G–L Oil" and "Dave

Covert Oil" were cashed. The evidence fully supports the conviction.

Judgment affirmed.