# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1202

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Donald Albin Blom, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  October 17, 2000

Filed:  February 12, 2001

_____

Before McMILLIAN, BOWMAN, and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

On May 26, 1999, Katie Poirier, a nineteen-year-old sales clerk, disappeared from a convenience store in Moose Lake, Minnesota.  For over three weeks, authorities and volunteers conducted a highly publicized search for Poirier and a man shown on the store's surveillance tape forcing her to leave.  Donald Albin Blom became a suspect.  Police obtained and executed warrants to search Blom's home in Richfield, Minnesota, his wife's property in Kerrick, Minnesota, and his wife's Chevrolet Suburban.  They seized four firearms found on the Kerrick property and ammunition found at all three locations.  Blom was charged in federal court with being a felon in

possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).  He was charged in state court with the kidnapping and murder of Poirier.  After the district court[1] denied Blom's motion to transfer venue on account of pretrial publicity, a jury convicted him of the federal firearm charge.  Blom appeals, arguing the district court erred in denying his motion for change of venue, in refusing to strike Juror No. 3 for cause, and in denying his motion to suppress the seized ammunition.  We affirm.

## I.  The Change of Venue Issue

Katie Poirier's disappearance and the resulting search for Poirier and her abductor generated a great deal of publicity.  Though Moose Lake is in northeastern Minnesota, much of the media coverage was statewide.   Following Blom's arrest on June 21, news stories published his criminal record, the discovery of human remains on his property, and speculation that he might be involved in a series of unsolved kidnappings and murders.  The media reported Blom being charged with Poirier's abduction on June 23 and the state court proceedings that followed.  His federal indictment on July 8 was well-publicized.  Early September brought more publicity when Blom confessed to abducting and murdering Poirier, was charged with murder and kidnapping in state court, and then recanted his confession.  Trial on the federal firearm charge began in late October, before Blom's murder trial in state court.

In response to Blom's pretrial change-of-venue motion, Magistrate Judge Raymond L. Erickson held a hearing and denied the motion on August 11, explaining:

> [Blom's] argument, that the extensive coverage of the media has denied
> him the opportunity for a fair Trial, rests exclusively on the quantum of
> publicity that his State and Federal Court charges have received.   He has

---

[1]The HONORABLE JOHN R. TUNHEIM, United States District Judge for the District of Minnesota.

not directed us to any specific portions of the media reports, or to any other evidence, which would require a finding of constitutional unfairness. In this respect, [Blom's] argument is indistinguishable from that presented to the Supreme Court, in Dobbert v. Florida, 432 U.S. 282, 303 (1977), which the Court determined was insufficient to establish a denial of due process.

Magistrate Judge Erickson left selection of the place of trial to the district court, noting that Blom had proposed the courthouse in Fergus Falls in western Minnesota. Blom appealed the change-of-venue denial, submitting as additional evidence a videotape of Blom's co-worker explaining on television news how he had transferred firearms to Blom. Judge Tunheim affirmed Magistrate Judge Erickson's order denying a change of venue, concluding the videotape "merely presents the viewpoint of a possible government witness, whose credibility the jurors chosen in this case will presumably have an opportunity to evaluate for themselves." However, Judge Tunheim ordered that trial be held in Minneapolis and that the jury be chosen from a statewide jury pool that excluded the Fifth Division, where Moose Lake and Kerrick are located.

We review the denial of a change of venue for abuse of discretion. See United States v. Green, 983 F.2d 100, 102 (8th Cir. 1992). When pretrial publicity is the issue, we engage in a two-tiered analysis. At the first tier, the question is whether "pretrial publicity was so extensive and corrupting that a reviewing court is required to 'presume unfairness of constitutional magnitude.'" Pruett v. Norris, 153 F.3d 579, 585 (8th Cir. 1998), quoting Dobbert v. Florida, 432 U.S. 282, 303 (1977). Because our democracy tolerates, even encourages, extensive media coverage of crimes such as murder and kidnapping, the presumption of inherent prejudice is reserved for rare and extreme cases. In all other cases, the change-of-venue question turns on the second tier of our analysis, whether the voir dire testimony of those who became trial jurors demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion. Pruett, 153 F.3d at 587.

-3-

Blom argues the district court abused its discretion by applying the Dobbert due process standard, rather than the prejudice analysis of Marshall v. United States, 360 U.S. 310, 313 (1959), where the Supreme Court, invoking its supervisory power over the federal courts, ordered a new trial because adverse publicity about the defendant had reached the jury. But Marshall concerned publicity that occurred during trial and that gave jurors information previously excluded. We have supervisory power to order a new trial in federal cases for reasons that do not amount to a due process violation. See, e.g., Murphy v. Florida, 421 U.S. 794, 804 (1975) (Burger, C.J., concurring). But the method of analysis adopted in Dobbert and Pruett to determine whether pretrial publicity requires a change of venue has been applied by this court in numerous federal criminal cases. See Green, 983 F.2d at 102-03; United States v. Faul, 748 F.2d 1204, 1216 n.9 (8th Cir. 1984), cert. denied, 472 U.S. 1027 (1985); United States v. Bliss, 735 F.2d 294, 297-98 (8th Cir. 1984); United States v. McNally, 485 F.2d 398, 403 (8th Cir. 1973), cert. denied, 415 U.S. 978 (1974). The district court did not abuse its discretion in applying that analysis here.

We further agree with the district court that the pretrial publicity in this case did not establish a presumption of inherent prejudice. Although the media coverage was extensive, it was not so inflammatory or accusatory as to presumptively create "a trial atmosphere that had been utterly corrupted by press coverage." Murphy, 421 U.S. at 798. Moreover, the district court took many precautions designed to assure the selection of an unbiased jury -- moving the trial from Duluth to Minneapolis; assembling a jury pool of 196, three times the normal size; expanding the area from which the pool was drawn to the entire State but excluding the Fifth Division, where Poirier was abducted; mailing questionnaires to the prospective jurors inquiring about their exposure to pretrial publicity; and increasing the number of peremptory strikes for each side. The court did not abuse its discretion in denying Blom's pretrial motion for change of venue. See Green, 983 F.2d at 102 ("it is preferable for the trial court to await voir dire before ruling on motions for a change of venue").

During voir dire, counsel and the district court focused on the impact of pretrial publicity, and Blom renewed his motion for a change of venue at the conclusion of the extensive voir dire. Therefore, we must proceed to the second tier of our analysis and determine whether the jury-selection process established an inference of actual prejudice. We must "independently evaluate the voir dire testimony of the impaneled jury in order to determine whether an impartial jury was selected, thus obviating the necessity for a change of venue." McNally, 485 F.2d at 403 (quotations omitted).

The district court conducted three days of individualized voir dire of seventy-five prospective jurors. The court struck thirty-seven for cause. Most of the strikes were based upon the juror's knowledge of and reactions to pretrial publicity. Fourteen jurors and alternates were selected. All had at least some knowledge that Blom was connected with or accused of Katie Poirier's abduction. Four knew of his prior confession. Seven had seen some publicity about this federal firearm charge. Five said they had learned something about Blom's prior felonies from the media. Each juror and alternate stated that he or she understood the state kidnapping and murder charges were separate from this case. Each declared he or she could put aside all pretrial publicity, recognize the presumption of innocence in Blom's favor, and render an impartial verdict based solely on the evidence presented at trial. The district court explained that the parties would stipulate to Blom's status as a convicted felon and instructed the jurors to put aside anything they knew about the nature of his prior convictions.[2]

Based on our review of this thorough record, we conclude that jury selection did not establish an inference of actual prejudice requiring the grant of Blom's change-of-venue motion. The lengthy voir dire testimony persuades us that the district court

---

[2]Although the government was precluded from presenting evidence regarding the nature of Blom's prior felonies at trial, see Old Chief v. United States, 519 U.S. 172, 174 (1997), the law assumes that jurors will follow this type of cautionary instruction. Shannon v. United States, 512 U.S. 573, 585 (1994).

carefully exercised its discretion in resolving this difficult issue and succeeded in selecting a fair and impartial jury. The record is much like that in McNally, 485 F.2d at 402-04, in Bliss, 735 F.2d at 299-300, and in United States v. Lewis, 738 F.2d 916, 923-24 (8th Cir. 1984), cert. denied, 470 U.S. 1006 (1985). As in those cases, there was no abuse of discretion in denying a change of venue.

## II. Juror No. 3

During jury selection, most of Blom's motions to strike prospective jurors for cause were granted, but nine were denied. Blom used peremptory challenges to strike eight of those nine prospective jurors. He used his remaining peremptories to strike prospective jurors who were not challenged for cause. This left Juror No. 3 as the only person who was unsuccessfully challenged for cause and served on the jury. Blom argues the district court erred in refusing to strike Juror No. 3, Carol Hansen, for cause.

The Sixth Amendment guarantees the right to trial "by an impartial jury." Impartiality is presumed "so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." Lockhart v. McCree, 476 U.S. 162, 184 (1986). Timely challenges for cause are the method by which a prospective juror's partiality is questioned. "It is good ground for such a challenge that a juror has formed an opinion as to the issue to be tried." Reynolds v. United States, 98 U.S. 145, 155 (1878). In a case of some notoriety, such as this one, the trial court must probe whether prospective jurors who have been exposed to pretrial publicity can conscientiously and properly carry out their sworn duty. As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 722-23 (1961):

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best

qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

The district court has substantial discretion in conducting voir dire, so most rulings on juror challenges are reviewed on appeal for abuse of discretion. See, e.g., United States v. Jones, 193 F.3d 948, 951 (8th Cir. 1999). However, when a prospective juror admits during voir dire that he or she has some preexisting impression or opinion based upon pretrial publicity, and when the district court then asks whether the prospective juror can lay that opinion aside and decide the case on the evidence presented and receives a positive response, the court's ruling on a motion to strike for cause is essentially one of credibility:

In such cases the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.

Reynolds, 98 U.S. at 156-57. In habeas cases, the Supreme Court considers this issue "plainly one of historical fact" and accords state court determinations a presumption of correctness. Patton v. Yount, 467 U.S. 1025, 1036 (1984). Similarly, in federal criminal cases, we will not overturn the district court's finding that a prospective juror can put aside any pretrial opinion and render a verdict based upon the evidence at trial "unless the error is manifest." McNally, 485 F.2d at 403.

During voir dire, Juror No. 3 admitted she had followed television and newspaper accounts of the Katie Poirier abduction and had read of Blom's criminal record and his recanted confession to the Poirier kidnapping and murder. She was then

-7-

questioned at length concerning her ability to put aside this information and any prior impressions and decide the case on the evidence presented at trial:

Q [BY THE COURT]. Do you think that you could set aside what you know about the state case if you were a juror in this matter and decide this case solely on the basis of the evidence that would be admitted in this courtroom concerning the firearm possession charge?

A. Yeah. I think so. I mean I can compartmentalize my life pretty well. I see that as something totally different. And I never heard nothing about it until they brought up the confession. And then that the firearms charge would still take place. I think it's a separate – it always seemed separate to me.

\* \* \* \* \*

Q [BY THE GOVERNMENT]. Can you put aside anything, everything else that you've read about his criminal past and basically judge him based on the fact that he's a convicted felon, that we've agreed to that?

A. Can I put it aside? I would say yes, I can. I'm good at compartmentalizing my life and my mind. I've been able to do it through my own living situation. And I live my life that way.

\* \* \* \* \*

Q [BY DEFENSE COUNSEL]. Okay, do you think that you can be a fair and impartial juror, judging Don Blom on those issues?

A. Yeah. Just based on his, whatever, the evidence and what's presented to me.

\* \* \* \* \*

Q. And am I correct or not correct that at this time you could look Don Blom in the eye and you can say at this time: I now presume you

innocent, and before I would think of convicting you, the government has to prove its case and has to prove it beyond a reasonable doubt?

A. Yes, I can do that.

After voir dire of the first eight prospective jurors, Blom challenged Jurors 1, 3, 5, 7, and 8. The government agreed to strike Jurors 1, 5, and 8 but opposed striking Jurors 3 and 7. The court asked defense counsel to comment further on Juror No. 3:

> That one, Your Honor, I don't want to go into further argument on. I don't feel strongly about the challenge. But there was enough, I will simply make the formal challenge.

The court then struck Juror No. 7 but not Juror No. 3, explaining:

> I will deny the motion to strike for cause juror number three. She probably came somewhat close, but I think there's enough on the record to indicate that she will be a fair and impartial juror.
>
> Juror number seven is somewhat close, too, but I did find that he was quite confused. Kind of wandered back and forth into confusion a little bit too much. He seemed very impacted by the state case. Certainly his original answers suggested that. So I think it's best to strike him for cause.

We have carefully reviewed the voir dire record and cannot conclude the district court committed clear or manifest error in crediting Juror No. 3's repeated declarations that she could put aside any impressions and opinions gained from the pretrial publicity and reach a verdict based only upon the evidence presented at trial. The district court and counsel made the proper inquiry, and the issue is essentially one of demeanor and credibility. The voir dire of Juror No. 3 did not overcome the presumption of juror impartiality. Moreover, defense counsel made only a "formal challenge" for cause and

used a handful of peremptory challenges to strike other prospective jurors who had not been challenged for cause.[3]

### III.  Suppression Issues

Blom argues the district court erred in denying his motions to suppress ammunition seized by state authorities during the warrant searches of his home in Richfield, his wife's red Chevrolet Suburban, and the property in Kerrick.  We review the district court's findings of fact for clear error; we review the ultimate Fourth Amendment seizure issues *de novo*.  United States v. Hawkins, 215 F.3d 858, 859 (8th Cir.), cert. denied, 121 S. Ct. 414 (2000).

The Richfield Home.  In executing a June 19 warrant to search Blom's home in Richfield, police seized his black pickup truck.  The vehicle was impounded and searched the next day.  Two rounds of .25 caliber ammunition were found in the pickup and seized.  Blom argues the search violated the Fourth Amendment because the warrant did not identify the address in Richfield and therefore failed to describe with particularity the place to be searched.  Blom did not raise this alleged defect in the district court, so we review for plain error, that is, "a clear error affecting substantial rights that resulted in a miscarriage of justice."  United States v. Pennington, 168 F.3d 1060, 1068 (8th Cir. 1999).

Special Agent Jon Hermann testified at trial that a Hennepin County District Court Judge signed the warrant at 7:00 a.m., after Hermann signed the warrant affidavit in the Judge's presence.  The affidavit listed the address to be searched, suggesting that

---

[3]This fact is relevant, but not dispositive.  See United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000) (federal law does not require a defendant to use a peremptory challenge to strike a juror who should have been removed for cause, in order to preserve the for-cause ruling on appeal).

the blank address space in the warrant was an inadvertent error. Agent Hermann arrived at Blom's house to execute the warrant at 8:45 a.m. An affidavit's specificity does not cure a warrant defect, but Agent Hermann's affidavit gave him a good faith basis to execute the warrant at Blom's Richfield home. See United States v. Curry, 911 F.2d 72, 76-78 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991); cf. Massachusetts v. Sheppard, 468 U.S. 981, 990 n.6 (1984). There was no plain error.[4]

Police obtained a second warrant to search the Richfield home on June 25. Blom argues this warrant lacked probable cause to authorize the seizure of ammunition. We disagree. The warrant was based upon an affidavit stating that Blom's co-workers believed he stored weapons in the rafters of the Richfield garage, and that the June 19 search was unlikely to have uncovered firearms and ammunition hidden in this area. The affidavit further averred that Blom was a convicted felon. These averments provided the judge who issued the warrant "a 'substantial basis' for his probable cause determination," and the warrant was therefore valid for suppression purposes. United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993), quoting Illinois v. Gates, 462 U.S. 213, 238 (1983); see United States v. Newman, 685 F.2d 90, 92 (3d Cir. 1982).

The Suburban Vehicle. A June 19 warrant to search the red Suburban was executed on June 20 when Blom and his family were found camping. Various types of ammunition were found and seized from a duffle bag inside the vehicle. Blom argues this seizure violated the Fourth Amendment because the warrant did not authorize seizure of ammunition. He also makes this argument regarding the seizure of ammunition from the pickup truck found at his Richfield home, because the truck was seized on June 19 and the first Richfield warrant did not authorize seizure of ammunition. The government responds, and the district court found, that the ammunition was contraband falling within the plain view exception to the Fourth

---

[4]In reviewing a suppression denial, we consider the entire record, including trial testimony. United States v. Martin, 982 F.2d 1236, 1240-41 n.2 (8th Cir. 1993).

Amendment's warrant requirement. See generally United States v. Beatty, 170 F.3d 811, 814 (8th Cir. 1999).

Both warrants authorized a search for small objects, and the officers therefore had a right to search where the ammunition was found. Thus, the ammunition falls within the plain view doctrine if the officers making the seizures had "probable cause to believe that the [ammunition was] linked to criminal activity." United States v. Bruce, 109 F.3d 323, 328 (7th Cir. ), cert. denied, 522 U.S. 838 (1997), citing Arizona v. Hicks, 480 U.S. 321, 326 (1987). Blom was a convicted felon, meaning his possession of firearms or ammunition was a federal crime. Blom argues the incriminating character of ammunition was not immediately apparent to the state officers who seized it because Minnesota law prohibits a convicted felon from possessing a firearm, but not ammunition. It is not clear Blom made this argument to the district court. In any event, we disagree. A state police officer who knew Blom was a convicted felon would likely know it was a federal crime for him to possess ammunition, and would surely know that possession of ammunition is "linked" to the state law crime of possessing a firearm.

Blom further argues the government failed to prove that the officers who seized the ammunition knew he was a convicted felon. This issue is more troubling. We reject the government's suggestion that a police officer with no knowledge of a citizen's criminal history may constitutionally seize firearms or ammunition without a warrant, so long as the citizen turns out to be, in hindsight, a convicted felon. In the plain-view cases relied upon by the district court, the officers seizing a firearm or ammunition either *knew* the suspect was a convicted felon, see United States v. Johnson, 707 F.2d 317, 322 (8th Cir. 1983); United States v. Wright, 641 F.2d 602, 606 (8th Cir.), cert. denied 457 U.S. 1021 (1981) (collective knowledge of officers on the scene may be considered), or *knew* the weapon was linked to the criminal activity being investigated, see United States v. Robertson, 706 F.2d 253, 254-55 (8th Cir. 1983); United States v. Johnson, 541 F.2d 1311, 1316 (8th Cir. 1976) (sawed-off

shotgun, an illegal weapon, is always contraband). Thus, the government must prove the officers knew *when they seized the ammunition* that Blom was a convicted felon.

The government argues it proved this fact because both warrant affidavits recited that Blom was a convicted felon. We would agree if the ammunition was seized by, or in the presence of, the officers who prepared and submitted the affidavits to the warrant-issuing court. But the pickup truck was searched the next day at a state crime lab, not during the warrant search at Blom's home in Richfield. And the officer who prepared the warrant affidavit for the red Suburban was not present when that vehicle was searched. We would also agree with this argument if the warrant affidavits had been attached to the warrants when executed, so that the officers on the scene could be expected to know the information in the affidavit, as well as the warrant. But it is not uniform practice in Minnesota to attach affidavits to search warrants, see State v. Erickson, No. C5-99-895, 2000 WL 558166 (Minn. App. 2000) (unpublished), and there is no evidence in this record that the affidavits were in fact attached to the June 19 Richfield and red Suburban warrants.

Unable to glean this critical fact from the warrant papers, we turn to the trial testimony of the officers who executed the two warrants. The ammunition in the pickup truck was seized by David Peterson, an Assistant Director of the Minnesota Bureau of Criminal Apprehension Forensic Science Laboratory. The day before he searched the pickup, Peterson participated in the search of Blom's Kerrick property and the seizure of the firearms that underlie this conviction, including a .25 caliber handgun. Blom does not challenge the seizure of the firearms. We conclude Peterson's participation in that seizure informed him that the ammunition he found in the pickup was sufficiently linked to criminal activity to justify its seizure on plain view grounds. Moreover, the vehicle had been lawfully impounded, so seizure of ammunition found within it was inevitable. See South Dakota v. Opperman, 428 U.S. 364, 373 (1976).

Special Agent Richard Andersen of the Bureau of Criminal Apprehension searched the red Suburban. He did not prepare the warrant application, and there is no evidence that he read the warrant affidavit or otherwise knew of Blom's criminal history, or that the officer who prepared the affidavit was present when the warrant was executed. Thus, the government failed to prove -- at the suppression hearing or at trial -- that this seizure came within the plain view exception to the Fourth Amendment's warrant requirements. However, because Blom was convicted for unlawfully possessing firearms, not ammunition, and because ammunition was lawfully seized at two other locations and admitted at trial, we conclude the admission of the small amount of ammunition seized from the red Suburban was harmless error.

The Kerrick Property. When police conducted a warrant search of the Kerrick property on June 19, they found firearms and ammunition. They seized the firearms but not the ammunition. They obtained and executed a second warrant on June 29, which did not authorize the seizure of ammunition. They obtained and executed a third warrant on June 30, which did authorize the seizure of ammunition. The "Evidence Receipts" summarizing the June 29 and June 30 seizures both list the same ammunition. Blom argues this ammunition was unconstitutionally seized on June 29 because the second warrant did not authorize the seizure of ammunition.

Special Agent Jerome Koneczny, who prepared the warrant affidavit for the third warrant, testified that he searched the Kerrick property on June 30 and seized live ammunition pursuant to that warrant. The ammunition was admitted into evidence without objection. Later in the trial, Special Agent Philip Hodapp, who prepared the affidavit for the June 29 warrant, testified that a National Guard search team found spent shell casings at various places on the property during the June 29 and June 30 searches. The casings were admitted into evidence without an objection based upon the issue Blom now raises on appeal. Neither Agent was cross-examined on whether the ammunition was seized on June 29 or June 30. In these circumstances, the issue was not properly preserved because the Evidence Receipts do not clearly establish

-14-

when the ammunition was seized.  See Martin, 982 F.2d at 1241.  Moreover, given the prior seizure of firearms at this location, the ammunition almost certainly fell within the plain view exception.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.