# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1843

_____

United States of America,       *
                             *

            Appellee,          *
             *   Appeal from the United States

      v.                   *   District Court for the
                             *   District of Minnesota.

Thomas Joseph Petters,       *
                             *

           Appellant.         *

_____

Submitted: February 17, 2011
Filed: December 9, 2011

_____

Before LOKEN, MELLOY, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

After a month-long trial and five days of deliberations, a jury convicted Thomas Joseph Petters of ten counts of wire fraud in violation of 18 U.S.C. §§ 1343, 2; three counts of mail fraud in violation of 18 U.S.C. §§ 1341, 2; one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and five counts of money laundering, in violation of 18 U.S.C. §§ 1957, 2. The district

court[1] sentenced Petters to 50 years imprisonment and 3 years supervised release. Petters appeals, challenging his conviction and sentence. We affirm.

I.

Petters was a prominent Minneapolis, Minnesota businessman. He owned numerous businesses, including Petters Group Worldwide LLC (PGW), Sun Country Airlines, Polaroid Corporation, Fingerhut, and Petters Company, Inc. (PCI). On September 8, 2008, Deanna Coleman, one of Petters's employees, confessed to government authorities that she was assisting Petters in perpetrating a multi-billion dollar Ponzi scheme through PCI. Under the scheme, investors were told that their money would be used to purchase electronic goods that were then sold for profit to large retailers such as Sam's Club and Costco. Over the sixteen days following Coleman's confession, she secretly recorded multiple conversations with Petters. Based on these conversations and other information supplied by Coleman, the Federal Bureau of Investigation, the Internal Revenue Service, and the United States Postal Inspection Service executed search warrants at Petters's business headquarters and residence. Government agents located counterfeit purchase orders purporting to show that PCI was owed over $3 billion by Costco, Sam's Club, and other retailers. Petters does not dispute that there was a fraud; rather, he argued at trial that he was not aware of the extent of the fraud and was not responsible for perpetrating the fraud.

A grand jury indicted Petters on multiple counts. Several individuals agreed to become cooperating witnesses, including Coleman and Larry Reynolds, a Petters business associate from California. Beginning in 2001, Petters wired money to Reynolds's company, Nationwide International Resources, Inc. (NIR), which returned the money to PCI or some other company owned by Petters, less Reynolds's

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

"commission." Reynolds aided in the fraud by supplying false purchase orders, arranging for warehouse space claiming that the space was used by PCI, and providing assurances to investors. In truth, PCI funds were funneled to purchase and maintain various Petters companies or to Petters personally.

As pretrial discovery and independent investigation developed, Petters learned that Reynolds was in the United States Marshals Service's Witness Security Program (WITSEC). Upon learning this information, Petters filed a motion requesting an order from the court compelling the government to disclose whether any informant, cooperating witness, or alleged co-conspirator was involved in the WITSEC program. At a pretrial hearing, the court denied the government's motion to close the hearing, but granted the government's request that Reynolds's name not be used during the argument on the motion to compel disclosure.

The district court directed the government to provide a redacted copy of Reynolds's WITSEC file, but the file was placed under seal and Petters was not allowed to introduce the file into evidence during the trial. The district court also prohibited the use of the WITSEC file to impeach Reynolds. However, the district court permitted the defense to refer to Reynolds by name, to reveal that he had a prior criminal history and was a participant in the WITSEC program, and to cross-examine Reynolds based on the information in the WITSEC file.

During the government's direct examination of Reynolds, Reynolds admitted to a history of involvement in scams, that he had cooperated in the past with the government in an effort to receive reduced sentences, and that the United States Marshals Service had placed him in the WITSEC program to protect him from a purported threat made against him and his family. Pertaining to Petters's case, Reynolds testified that Petters requested fraudulent invoices and that Reynolds provided those fraudulent invoices so that Petters could secure funding from other sources. Reynolds also testified that after he rendered assistance and additional help

in perpetuating fraudulent transactions, his relationship with Petters strengthened and they started conducting more business together which included both legitimate and fraudulent transactions.

During cross-examination, Reynolds admitted that, as a young attorney, he defrauded insurance companies and clients; that he fled to Europe to avoid prosecution; that he was later found, arrested, and extradited to the United States; that he was disbarred; and that he served time for defrauding insurance companies. He further testified that after release from prison, he began a clothing business that later went bankrupt and participated in a scheme to purchase a large quantity of marijuana for which he received a three year term of incarceration. Reynolds testified that, after his release on the marijuana conviction, he joined a scheme to steal money from a bank account and to convert those proceeds to jewelry purchases. When that scheme was discovered, Reynolds again cooperated with the government by wearing a wire and testifying against a target of the investigation, George Kattar. He received a sentencing reduction for his cooperation and later entered the WITSEC program when Kattar reportedly put out a contract on Reynolds's life.

At one point during the cross-examination, after Reynolds denied being a member of the mafia or associating with members of the La Cosa Nostra mob, defense counsel attempted to impeach Reynolds using his WITSEC file. At a sidebar conference, defense counsel indicated that he wished to use the WITSEC file to show that Reynolds was a liar. Stating that counsel had "established that all over," the court refused to allow defense counsel to use the WITSEC file to impeach Reynolds. When cross-examination resumed, defense counsel questioned Reynolds about criminal activities he was involved in while a participant in the WITSEC program. After proceedings ended for the day, defense counsel made an offer of proof as to what he would have presented from the WITSEC file, and later filed under seal the questions he would have asked Reynolds, attaching specific evidence from the WITSEC file to support the questions.

After five days of deliberations, the jury returned guilty verdicts on all twenty counts of the indictment. The district court subsequently sentenced Petters to 50 years of imprisonment to be followed by three years of supervised release.

## II.

Petters argues that his Sixth Amendment rights were violated when the district court sealed Reynolds's WITSEC file, limited Petters's ability to reference Reynolds by name at a pretrial hearing, prevented Petters from introducing the file into evidence, and prohibited the use of the WITSEC file to impeach Reynolds. Specifically, Petters argues that the district court violated his Sixth Amendment rights by prohibiting him from (1) presenting a complete defense, (2) confronting Reynolds on cross examination, and (3) receiving a public trial.

## A.

Petters maintains that introduction of the WITSEC file was necessary to support his defense theory that Reynolds was the mastermind of the PCI fraud and that Petters was himself fooled and defrauded. Petters asserts that the file would have shown that Reynolds had "a track record of schemes as brazen as the PCI fraud." Thus, Petters claims that had the jury been able to review the entire WITSEC file evidence, it could have determined that it was Reynolds who designed and implemented the Ponzi scheme and that Petters was without fault.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (internal citations

omitted). However, "[t]he right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Michigan v. Lucas, 500 U.S. 145, 149 (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987)). For instance, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988). To that end, the "Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." Crane, 476 U.S. at 689-90 (citation and internal quotation marks omitted).

The district court did not abuse its discretion in prohibiting Petters from introducing Reynolds's WITSEC file into evidence. The information contained in the file was collateral to the crimes alleged in the indictment, and admitting it would have risked confusing the issues presented to the jury at trial. Further, defense counsel was able to vigorously attack Reynolds's credibility in the cross-examination by establishing that he had participated in multiple other fraud schemes and cooperated with the government in an effort to receive leniency in punishment. Accordingly, Petters was not denied the ability to present a complete defense.

B.

Next, Petters asserts his right to confront Reynolds was stymied when the district court prohibited inquiry into some of Reynolds's past criminal activities, including Reynolds's connections to organized crime.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Although the Sixth Amendment guarantees a defendant an

opportunity for effective cross-examination of witnesses, that right is not unfettered. See United States v. Dale, 614 F.3d 942, 956-57 (8th Cir. 2010), cert. denied, 131 S. Ct. 1814 (2011); United States v. Wipf, 397 F.3d 677, 682 (8th Cir. 2005) ("The United States Supreme Court has emphasized that 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam))). "[D]istrict courts 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" Dale, 614 F.3d at 956 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). To state a viable Confrontation Clause challenge to the district court's decision to limit cross-examination, the defendant must establish "that a reasonable jury might have received a *significantly* different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination." Id. at 957 (emphasis added). A trial court's decision to limit cross-examination will not be reversed unless there has been a clear abuse of discretion and a showing of prejudice to the defendant. See United States v. Love, 329 F.3d 981, 984 (8th Cir. 2003).

Defense counsel was able to show through cross-examination that Reynolds had a significant past history of involvement in schemes to defraud others and had been previously convicted for those schemes. Also, Reynolds acknowledged that he had cooperated with the government in the past to secure more lenient sentences. Further, as the district court pointed out, defense counsel was able to clearly establish that Reynolds had a proclivity for lying, especially when he stood to gain from his deceit. Petters has failed to show that allowing defense counsel to cross-examine Reynolds on additional involvement in criminal schemes would have provided the jury with a significantly different view of Reynolds or his credibility. See Dale, 614 F.3d at 957. Thus, the district court did not clearly abuse its discretion when it

limited the cross-examination, and Petters's right to confront Reynolds was not impinged.

C.

Petters argues that by sealing the WITSEC file and limiting reference to Reynolds in a pretrial hearing, the district court deprived Petters of his Sixth Amendment right to a public trial. See Waller v. Georgia, 467 U.S. 39, 44-47 (1984) (recognizing that Sixth Amendment protects accused's right to public trial).

Conducting public trials "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." Press-Enter. Co. v. Superior Court, 464 U.S. 501, 508 (1984). Although the right is important, it is not without limitations. The Supreme Court has held that, in order to justify completely closing a trial or suppression hearing to the public,

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Waller, 467 U.S. at 48. While defendants retain a Sixth Amendment right to an open courtroom, that right "may give way in certain cases to other rights or interests such as . . . the government's interest in inhibiting disclosure of sensitive information." Id. at 45.

Petters argues that the district court effected a closure of the pretrial hearing and the trial because there was "a restriction in the information flow during a presumptively-public proceeding." Petters asserts that closures occurred when the district court prohibited the use of Reynolds's name or identifying information during

a pretrial hearing, when the district court would not allow the introduction of the WITSEC file at trial, and when the district court required that the offer of proof of the WITSEC file be sealed.

In support of his first claim of closure, Petters cites United States v. Rosen, an Eastern District of Virginia case. 487 F. Supp. 2d 703 (E.D. Va. 2007). There, the district court held that the government's proposal to redact information that it claimed was of national security interest would "effect[] a closure of the trial." Id. at 720. Thus, the court determined that the proposal violated the Sixth Amendment unless the government met the Waller and Press-Enterprise standards. Id. In this circuit, however, we have held that where the trial court orders only a partial closure, there need only be a showing of a "substantial reason" for the partial closure, as opposed to Waller's "overriding interest" requirement. See Garcia v. Bertsch, 470 F.3d 748, 752-53 (8th Cir. 2006). The justification for this lower standard is that "a partial closure does not 'implicate the same secrecy and fairness concerns that a total closure does.'" United States v. Farmer, 32 F.3d 369, 371 (8th Cir. 1994) (quoting Woods v. Kuhlmann, 977 F.2d 74, 76 (2nd Cir. 1992)).

Assuming for the sake of argument that the district court's prohibition of the use of Reynolds's name during the pretrial proceeding constituted a partial closure of the courtroom, the government's interest in the integrity of the WITSEC program and the safety of Reynolds and his family were substantial reasons justifying the restrictions imposed during the pretrial hearing. Additionally, the use of Reynolds's name was tangential to the numerous issues addressed by the court at the pretrial hearing. Thus, Petters did not suffer a violation of his Sixth Amendment right to a public trial.

Further, we reject Petters's attempt to use the public-trial right to open government records that were deemed inadmissible at trial. Petters does not offer any support for his contention that the sealing of the WITSEC file and the offer of proof

constituted a closing of a proceeding. See, e.g., United States v. Vazquez-Botet, 532 F.3d 37, 51-52 (1st Cir. 2008) ("The defendants point to no precedent in the Supreme Court, this circuit, or elsewhere extending the Sixth Amendment public-trial right to an outside-of-trial, question-and-answer offer of proof—or indeed, any type of offer of proof.").

## III.

Petters next argues the district court denied him a proper instruction based on his theories of defense—that he was an unwitting participant in the fraud conceived by others and that he relied on his attorney's advice when he discovered potential fraud in PCI.

Petters claims the district court erred in refusing his proffered jury instruction[2]

---

[2]Petters would have had the jury instructed as follows:

When you consider the good faith defense, you should consider only whether the defendant believed he was acting in conformance with the law. The test is whether the defendant's own thought process was one of good faith. That subjective thought process provides an absolute defense, even if you find that the defendant's subjective beliefs were unreasonable or wrong.

When you consider the good faith defense, it is the defendant's belief that is important. Whether that belief is reasonable or not is not an issue. It is the sincerity of his belief that determines if he acted in good faith.

If the defendant's belief is objectively unreasonable, you may consider that in determining his sincerity of belief, but an unreasonable belief sincerely held is good faith.

Again, the burden is upon the Government to prove, beyond a

on the defense that he was an unwitting participant in the Ponzi scheme. Petters concedes that the district court offered what he describes as "cursory" and "bare bones" instructions[3] that support this defense but maintains that the court should have

reasonable doubt, that the defendant did not act in good faith.

(Doc. 355 at 3.)

[3]The district court instructed as follows:

Intent or knowledge, as referenced in previous Jury Instructions, may be proved like anything else. You may consider any statements made and acts done by the Defendant, and all the facts and circumstances in evidence which may aid in a determination of the Defendant's knowledge or intent.

You may, but are not required to, infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

You may find that the Defendant acted knowingly if you find beyond a reasonable doubt that he deliberately closed his eyes to what would otherwise have been obvious to him. You may not find that the Defendant acted knowingly, however, if you find that he was merely negligent, careless, or mistaken, or that he honestly believed that no wrongdoing was taking place.

(Jury Instruction 22, Doc. 350 at 41.)

The Defendant contends that he is not guilty of the crimes charged. He asserts that Reynolds, Coleman, Catain, and White defrauded him, and that he was unaware that any criminal conduct was taking place. He asserts that he did not intend to defraud anyone.

(Jury Instruction 25, Doc. 350 at 47.)

given "some context for his theory of defense."  Because he is challenging the district court's formulation of the jury instruction, we review this matter for abuse of discretion.  United States v. Williams, 109 F.3d 502, 508 (8th Cir. 1997).

"[A defendant] is entitled to a proposed instruction 'that conveys the substance of his request if . . . it is supported by the evidence in the case and is a correct statement of the law.'"  United States v. Gary, 341 F.3d 829, 834 (8th Cir. 2003) (quoting United States v. Whitehead, 176 F.3d 1030, 1037 (8th Cir. 1999)), overruled on other grounds by Chambers v. United States, 129 S. Ct. 681 (2009).  "[T]his entitlement does not guarantee a particular formulation of the proposed instruction."  Id.  Although the instruction that Petters requested contained more background than the instruction adopted by the district court, he fails to show how the district court's "bare bones" instructions were inadequate.  Because the district court's instructions adequately stated Petters's defensive posture that he was an unwitting participant in the Ponzi scheme, we find no abuse of discretion.

As to his second allegation of instruction error, Petters argues he should have received an "advice of counsel" instruction based on his consultation with counsel about various PCI affairs.  "[T]o rely upon the advice of counsel in his defense, a defendant must show that he: (i) fully disclosed all material facts to his attorney before seeking advice; and (ii) actually relied on his counsel's advice in the good faith belief that his conduct was legal."  United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006).  Petters argues that this instruction was appropriate because his attorneys were "heavily involved in many PCI transactions," "counsel drew up all the promissory notes," "counsel assured investors that lawsuits against PCI were frivolous," and "counsel assured investors all was well at the company."  Despite these assertions, Petters does not claim that he fully informed his counsel of his actions and then relied upon counsel's advice that his actions were legal.  Id. at 896-97 ("[A] defendant is not immunized from criminal prosecution merely because he

-12-

consulted an attorney in connection with a particular transaction."). Thus, the district court properly denied the instruction.

## IV.

Petters claims that his motion for a change of venue should have been granted because of the extensive media coverage of Petters's arrest and subsequent pretrial matters.

When reviewing whether pretrial publicity violates a criminal defendant's right to a trial by a panel of impartial and indifferent jurors, we engage in a two-tier analysis. See United States v. Blom, 242 F.3d 799, 803 (8th Cir. 2001); see also Skilling v. United States, 130 S. Ct. 2896, 2914-17 (2010). "At the first tier, the question is whether pretrial publicity was so extensive and corrupting that a reviewing court is required to presume unfairness of constitutional magnitude." Blom, 242 F.3d at 803 (quotations omitted). "In all other cases, the change-of-venue question turns on the second tier of our analysis, whether the voir dire testimony of those who became trial jurors demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion." Blom, 242 F.3d at 803.

Petters maintains that the district court erred under the first tier in denying his motion to change venue because media coverage in Minneapolis following his arrest entitled him to a presumption of prejudice. The Supreme Court has reminded us that "[a] presumption of prejudice . . . attends only the extreme case." Skilling, 130 S. Ct. at 2915. The Court explained that those extreme cases occur where there is a small community from which to select jurors, where the pretrial publicity contains a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," and where the "trial swiftly follow[s] a widely reported crime." Id. at 2916. Petters argues that his is an extreme case because the media coverage included statements that he had confessed to the

-13-

crime, he had been secretly recorded confessing to the fraud, he had encouraged others to flee the country to avoid prosecution, others were pleading guilty and implicating him, he had caused numerous bankruptcies and job losses, and he lived a lavish lifestyle. Further, most photos of him depicted him in an orange jumpsuit. Petters argues that this type of media coverage coupled with the downturn in the economy severely prejudiced the jury pool against him.

The Supreme Court emphasized that its decisions "cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process." Skilling, 130 S. Ct. at 2914. As Petters acknowledged, the size of the jury pool would not favor a presumption of prejudice. Also, although there was substantial coverage of the case, including the government's claim that Petters had confessed to the crime, there was also substantial media coverage that he claimed to be innocent of the charges. In reviewing the pretrial media, the district court found that "[w]hile some of the media coverage, admittedly, has been less than flattering to Defendant, the Court cannot conclude on the present record that it has been 'so inflammatory or accusatory' that one must presume Defendant cannot obtain a fair trial here." In an order issued less than two weeks before the start of the trial, the district court found that media coverage of the case had "died down substantially since the initial media frenzy surrounding the execution of the search warrants" and that the length of time between the initial media coverage and the start of trial "mitigate against any presumption of prejudice." Furthermore, the district court noted that responses to the questionnaires submitted to the venire panel reflected that only a small number of veniremembers had formed an opinion concerning Petters's guilt, and those individuals were excluded from the jury pool. We agree with the district court that, based on these findings, Petters was not entitled to a presumption of prejudice, and the district court did not abuse its discretion in denying the motion to change venue.

V.

Finally, Petters argues that his sentence was procedurally deficient because the district court failed to consider the section 3553(a) factors and to explain the sentence on the record to allow for meaningful appellate review.

We review the sentencing decision of the district court under a deferential abuse-of-discretion standard. United States v. Lozoya, 623 F.3d 624, 625 (8th Cir. 2010). Under this standard, we initially review a sentence for significant procedural error and then, if necessary, for substantive reasonableness. United States v. Fischer, 551 F.3d 751, 754 (8th Cir. 2008). Procedural errors include, among other things, "failing to consider the § 3553(a) factors . . . or failing to adequately explain the chosen sentence." Gall v. United States, 552 U.S. 38, 51 (2007). As to the section 3553(a) factors, a district judge is not required to recite each factor. United States v. Battiest, 553 F.3d 1132, 1136 (8th Cir.), cert. denied, 129 S. Ct. 2452 (2009). Rather, as we have previously held, "the district court fully considered the section 3553(a) factors and sufficiently explained its decision where the court had significant exposure to the defendant's PSR, the parties' sentencing memoranda and their arguments at the sentencing hearing and imposed a sentence which he justified by specific reference to several § 3553(a) factors." United States v. Bryant, 606 F.3d 912, 919 (8th Cir. 2010) (quotations omitted).

At sentencing, Petters argued that a reduced sentence was appropriate because, under the guidelines, there was no empirical basis for the harsh sentences given to white-collar offenders based on the amount of loss and because there was a sentencing disparity between Petters and similarly-situated defendants. After the district court heard argument on these points, Petters requested that the district court find "[t]hat the guidelines itself has no empirical basis." The district court denied that request, explaining that the guidelines were advisory and that it was unnecessary to condemn the guidelines in total. The court then heard from Petters's attorney, from

-15-

Petters, and from the government, after which the court referenced each section 3553(a) factor and discussed how those factors applied to Petters. In light of the thorough sentencing hearing in which the district court addressed Petters's argument concerning the empirical basis for the guidelines, recited the section 3553(a) factors, considered how the section 3553(a) factors applied to Petters, and created a meaningful record for appellate review, we reject Petters's argument that the district court committed procedural error in the sentencing.

## VI.

We affirm Petters' conviction and sentence.

_____