# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-3789

_____

United States of America

*Plaintiff - Appellee*

v.

Mario M. Contreras

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Aberdeen

_____

Submitted: October 22, 2015
Filed: March 7, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Mario Contreras of second degree murder[1] and assault resulting in serious bodily injury.[2] The district court[3] sentenced Contreras to the mandatory minimum sentence of 360 months' imprisonment. On appeal, Contreras argues that (1) the district court erred in denying his motion for judgment of acquittal based on sufficiency of the evidence; (2) the district court erred in denying his motion for a new trial based on purportedly prejudicial pretrial publicity; (3) the district court made erroneous evidentiary rulings; (4) the district court clearly erred in determining that Contreras was competent to be sentenced; and (5) Contreras's sentence violates the Eighth Amendment. We affirm.

## I. *Background*

"We present the facts in a light most favorable to the verdicts, drawing all reasonable inferences from the evidence that support the jury's verdicts." *United States v. Ramon-Rodriguez*, 492 F.3d 930, 934 (8th Cir. 2007) (citation omitted).

A jury found Contreras guilty of killing his daughter A.C. She was born on December 31, 2009, and was two years old at the time of her death in January 2012. A.C. was one of Contreras's seven children.

Contreras had little involvement with A.C. for the first 18 months of her life. But in August 2011, Contreras watched A.C. one evening at the request of her mother, Shannon Sine. During the evening, Contreras slapped A.C. very hard on the bare buttocks. After Contreras returned A.C. to Sine, Sine noticed a large handprint on A.C.'s buttocks. Sine immediately called Contreras, who apologized for spanking

---

[1]*See* 18 U.S.C. §§ 1111, 1153, 3559(f)(1).

[2]*See* 18 U.S.C. §§ 113(a)(6), 1153, 3559(f)(3).

[3]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

A.C. hard and explained that he had disciplined A.C. because she would not throw away her diaper. With her mother's assistance, Sine photographed the handprint on A.C.'s buttocks for documentation.

In December 2011, Sine and her husband met Contreras in a grocery store parking lot to retrieve A.C. after a visit with Contreras. Contreras had been watching A.C. for a couple of days. During the exchange, A.C. pointed at Sine's new husband and said, "That's my Dada." After A.C.'s statement, Contreras stopped talking and left shortly thereafter.

On December 28, 2011, about two weeks before her death, A.C. underwent a physical examination prior to enrolling in school. The examining physician testified that A.C. was a healthy child without any issues. The trial record includes the doctor's report of the physical.

On Wednesday, January 4, 2012, Sine asked Contreras to watch A.C. for a couple of days. Contreras's finances, particularly his child-support duties for seven children, caused him great stress. In addition, his employer had put him on a "short leash." Contreras had been routinely late for work during much of 2011 and received several warnings from his supervisor. He had to commute about 45 minutes to an hour to his workplace.

After watching A.C. for two days, Contreras, on Friday, January 6, 2012, called Sine requesting to keep A.C. through the weekend. Sine agreed. On Sunday night, January 8, 2012, Contreras again called Sine and asked her if he could extend A.C.'s stay until the next morning so that he could take her to school. Sine agreed. Sine had talked to A.C. on the phone during each of those five nights that A.C. was in Contreras's care. Sine testified that A.C. sounded normal during those conversations. Contreras would later tell the FBI that A.C. was "fine" on Sunday night. Unfortunately, Sine spoke to A.C. that Sunday night for the last time.

-3-

Sine also spoke with Contreras on Sunday night "about the child-support obligation." According to Sine, he "wanted to file for joint custody and stop the child support." He explained that he was hoping not to pay anymore child support; when he asked Sine to terminate the child support, she told him "no." Sine later recalled that she had, in fact, texted Contreras prior to the spanking incident, asking him whether he would be able to have A.C. half of the time "with an agree[ment] that there is no child support."

On Monday, January 9, 2012, Contreras had to be at work at 8 a.m. He had four of his children (all under age 11) in his care that morning with no other adult helping him. A.C. was known to be a particularly fussy child in the morning. But instead of going to work on Monday morning, Contreras went to his uncle's residence near Waubay, South Dakota. Contreras, carrying A.C., approached his uncle, Dennis Gill. Upon seeing A.C. unconscious, Gill knew that Contreras needed to get A.C. to the hospital. Gill did not call 911 and did not go with Contreras to the hospital. He testified that he did not go with Contreras to the hospital because his back was hurting and "[b]ecause of the panic, and [he] thought she was gone at the time."

Contreras rushed A.C. to a hospital in Sisseton, South Dakota, and the police received a call from the hospital of an unresponsive juvenile at 8:39 a.m. Contreras called Sine and informed her that A.C. was in the intensive care unit. One relative at the hospital thought that it was unusual that Contreras appeared emotionless at the hospital, giving doctors only one-word answers to their inquiries. That relative testified that the doctors were "having to probe very much to get information from him about the sequence of what had happened just within the last few hours or hour."

A.C. remained unresponsive at the Sisseton hospital. After air-ambulance transport to Fargo, North Dakota, A.C. was examined by Dr. Arne Graff, "a subspecialist in child abuse pediatrics." Dr. Graff was told that Contreras attributed the child's condition to having fallen off a chair. Dr. Graff told Contreras that the

child's injuries were totally inconsistent with a fall. Contreras did not respond. A.C. never regained consciousness, and life support was terminated on January 11, 2012.

St. Paul Coroner Dr. Victor Froloff conducted the autopsy on A.C. and contacted the FBI with his concerns that the child had been beaten to death. He documented 18 subgaleal hemorrhages on multiple planes of A.C.'s head. Had A.C. merely fallen, her injury would have shown a discrete area of impact. When asked at trial whether he had "an opinion within a reasonable degree of medical certainty [as to] what looked like the instrumentality or what caused [the] marks" on A.C., Dr. Froloff opined that he was "highly suspicious" that the hemorrhages were induced "by a fist, but could be . . . by just punching." Dr. Froloff classified A.C.'s injuries as "acute" and estimated that the injuries occurred within approximately "72 hours" of A.C. dying at the hospital. He opined that "the cause of death is traumatic brain injury due to physical assault." Dr. Froloff completed the death certificate, labeling the cause of death as homicide from physical assault.

FBI Agent Rob Mertz interviewed Contreras; during the interview, Contreras stated a number of times that A.C. was "fine" on Sunday night, January 8, 2012. He claimed that A.C. was sitting on a chair in the kitchen; he then went into another room to change a diaper on another child and heard a "thump." According to Contreras, "[h]e turned around and saw [A.C.] lying on the kitchen floor. She was groaning. He said her eyes were already rolling back into her head." He claimed that "her toes were starting to point in and stiffen up."

Contreras was indicted by a federal grand jury on charges of second-degree murder, in violation of 18 U.S.C. §§ 1111, 1153, and 3559(f)(1) ("Count 1"); manslaughter, in violation of 18 U.S.C. §§ 1112 and 1153 ("Count 2"); assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 113(a)(6), 1153, and 3559(f)(3) ("Count 3"); and child abuse, in violation of 18 U.S.C. § 1153 and South Dakota Codified Laws § 26-10-1 ("Count 4"). Count 4 tracked the two-year time

period that A.C. was alive. Over the government's objection, the district court severed Count 4 from the rest of the indictment. After severing Count 4, the government moved under Federal Rule of Evidence Rule 404(b) to admit the August 2011 "swat" or handprint that Contreras had inflicted on A.C.'s buttocks in August 2011. The district court eventually allowed the government to present testimony regarding the incident.

At trial, Dr. Froloff testified regarding his findings during the autopsy and his listed cause of death as homicide. Likewise, Dr. Graff testified to his physical examination of A.C. and all of the tests, scans, and records that he had reviewed. Dr. Graff testified to the 18 different contusions around A.C.'s head and the multiple sites of trauma. According to Dr. Graff, the injuries to the top of A.C.'s head were "inconsistent with the normal fall mechanics of a child." He opined "within a reasonable degree of medical certainty" that "the injuries [that he] observed on [A.C.] in January of 2012 [were] consistent with a physical assault." He also held the opinion that A.C.'s injuries "are not consistent with a simple fall off a chair." Dr. Graff agreed with the death certificate that the manner of A.C.'s death "seems to be consistent with" a "homicide."

Clinical pathologist Dr. Kenneth Snell testified to his review of all the records, scans, photos, autopsy report, and death certificate. Dr. Snell explained that one fall equals one contusion on one side of the head and that A.C. had suffered injuries on both sides of her head and to the top of her head and forehead. Dr. Snell testified that it was not possible to get 18 hemorrhages on one's head from a single fall and agreed that the injuries were consistent with homicide.

Contreras's expert, Dr. Brad Randall, confirmed that he "for the most part . . . agree[d] with the factual determination of Dr. Froloff." He agreed that he "couldn't really dispute his finding of 18 different subgaleal hemorrhages, because he was there in person, and that's a better tell than just looking at a photograph." He also agreed

that "if the child would have fallen from a chair of two feet in height, . . . that would not cause 18 subgaleal hemorrhages." He agreed with Dr. Snell's testimony that "when you fall, you are going to have one contusion." He further agreed that "three or four blows with the knuckles to the head or four or five blows could cause these 18 subgaleal contusions."

The jury found Contreras guilty of Counts 1 and 3.[4] A month after the verdict, Contreras refused to cooperate with his attorney and claimed mental illness. He had been released on bond for the 12 months prior to trial and had not exhibited any problems, mental or otherwise, during that time. The district court ordered Contreras examined by a local psychiatrist, who saw Contreras for only 35 minutes, performed no tests, and opined that Contreras may have some mental problems because he refused to talk. The government requested a more complete examination, and Contreras was sent to a federal medical center for a two-month examination. At the completion of the examination, the Bureau of Prison's psychiatrist prepared a report opining that Contreras was competent and was feigning mental problems. The Bureau of Prison expert testified at the competency hearing and was cross-examined. The district court found Contreras competent to be sentenced, and it thereafter sentenced Contreras to the mandatory minimum of 360 months' imprisonment on each of the two counts to be served concurrently.

## II. *Discussion*

On appeal, Contreras argues that (1) the district court erred in denying his motion for judgment of acquittal based on sufficiency of the evidence; (2) the district court erred in denying his motion for a new trial based on purportedly prejudicial pretrial publicity; (3) the district court made erroneous evidentiary rulings; (4) the

---

[4]The verdict form advised the jury, "Do not consider the Verdict Form for Count 2 if you unanimously find Defendant, Mario Contreras, guilty of Count 1."

district court clearly erred in determining that Contreras was competent to be sentenced; and (5) Contreras's sentence violates the Eighth Amendment.

## A. *Sufficiency of the Evidence*

After trial, Contreras renewed his motion for judgment of acquittal, arguing that the government failed to present sufficient evidence to find him guilty of Counts 1 and 3 beyond a reasonable doubt. The district court found that conflicting lay and expert testimony were presented at trial. It determined that, "[t]aken as a whole, . . . the weight of the evidence supported conviction beyond a reasonable doubt on each count of conviction" and accordingly denied the motion. In support of its ruling, the court noted that "[t]he location of the injuries to the skull, the number of the separate injuries to the skull, and the severity of the injuries to the victim all strongly supported the conclusion that the Defendant hit the head of the victim several times with his closed fist." According to the court, "[t]he evidence established that this was not a shaken baby case, but rather a baby that got beaten as opposed to a single fall from a chair or even the table." The court emphasized that "[n]o one else had access to the victim that could have caused such injuries during the time period in which they were sustained."

On appeal, Contreras argues that "the [g]overnment's evidence supported Mr. Contreras's innocence of the crimes charged at least as strongly as it supported his guilt." Contreras claims that the government's case required the jury to infer when the injuries occurred and that the evidence did not allow a reasonable juror to make that inference beyond a reasonable doubt. First, he cites Dr. Froloff's testimony that the "injuries in the head, in the subgaleal tissue, and contusions in the head, it's [sic] at least three days old." Second, Contreras points to Dr. Snell's testimony that some of A.C.'s injuries were "acute," which he defined as "less than five days old." Third, Contreras notes that Dr. Graff testified that "[i]t's impossible" to date a retinal hemorrhage. In summary, Contreras asserts that while all the experts testified that it was possible for A.C. to have sustained the injuries when the government alleged, the

witnesses also stated that it was possible for the injuries to have been caused earlier and possibly even before the child was in Contreras's care. He cites evidence that A.C. had symptoms of a concussion when she came to his home on January 4, 2012, and that she had fallen and was injured on at least three occasions during the weekend prior to her death.

"We review a challenge to the sufficiency of evidence de novo, considering the evidence in the light most favorable to the government." *United States v. Gentry*, 555 F.3d 659, 664 (8th Cir. 2009) (citation omitted).

"Second-degree murder requires proof of the unlawful taking of a human life." *United States v. Good Bird*, 197 F.3d 1203, 1204 (8th Cir. 1999) (citing *United States v. Lame*, 716 F.2d 515, 518 (8th Cir. 1983)); *see also United States v. Downs*, 56 F.3d 973, 974 (8th Cir. 1995) (stating that the elements of second-degree murder require proof that the defendant "unlawfully killed [the victim] with malice aforethought"). "[A]ssault resulting in serious bodily injury is *not* a lesser included offense of murder." *United States v. Cavanaugh*, 948 F.2d 405, 410 (8th Cir. 1991). "[A]ssault resulting in serious bodily injury contains different elements than murder . . . ." *Id*. "The elements of the 18 U.S.C. § 113(a)(6) offense of assault resulting in serious bodily injury are (1) an intentional assault that (2) results in serious bodily injury, committed (3) by an Indian and (4) within Indian Country." *United States v. Stymiest*, 581 F.3d 759, 766 (8th Cir. 2009) (citation omitted).

Contreras contends that the government failed to prove *when* the injury occurred. The indictment alleged a nine-day window in which A.C. may have been injured—"[o]n or about between January 1, 2012, and January 9, 2012." The evidence shows that Contreras was the sole adult who had physical custody of the victim *between January 4 and January 9, 2012*, and was the *only* adult with A.C. when she became unconscious. While Contreras told the FBI that the child became unconscious after falling from a chair, three physicians testified that a fall from such a chair is

inconsistent with the 18 contusions observed on four different parts of the child's head; in fact, Dr. Froloff testified, contrary to Contreras's claim, that A.C.'s injuries were consistent with a beating.

As to the timing of the injury, Dr. Froloff testified that the hemorrhages probably were inflicted within the 72 hours preceding death. A.C. arrived at the hospital at 8:39 a.m. on Monday, January 9, 2012, and died on Wednesday afternoon, January 11, 2012, at 5:00 p.m. Dr. Snell testified that A.C.'s injury was "acute" and that this "acute injury" was

> less than five days old. Could be a few days of that. But if we start at the time of death, we know she's in the hospital for three days, so we back up from there, which would tell us *the injury occurred approximately right about the time or right before she was admitted to the hospital*.

(Emphasis added.)

Both Dr. Froloff's and Dr. Snell's estimates of when A.C. sustained the fatal injuries place her in Contreras's care. Furthermore, A.C. underwent a physical exam with no reported issues at the end of December 2011, and A.C.'s mother testified that A.C. sounded fine on the telephone while in Contreras's care on the Sunday night prior to A.C. being taken to the hospital the next day. Based on the evidence in this record, we hold that the jury could conclude beyond a reasonable doubt that A.C.'s injuries fell within the time period specified in the indictment and that sufficient evidence exists to support Contreras's convictions on Counts 1 and 3.

B. *Pretrial Publicity*

Approximately one week before trial, Contreras filed a motion for a local jury panel. Contreras wanted jurors to be selected from the Southern Division of South Dakota rather than the Northern Division. The district court denied the motion, stating, "Defendant has not cited any legal authority to support his position that jurors

should be selected from the Southern Division. Defendant has also failed to supply any evidence of widespread publicity in northeastern South Dakota or undue inconvenience of jurors from that area."

After trial, Contreras moved for a new trial, claiming extensive and misleading publicity immediately preceding and during the trial. The district court denied Contreras's motion. The court explained that after jury selection, "there was no one left on the jury panel who indicated they would be affected by anything they had previously been exposed to concerning this case." The court found no showing of extensive or misleading publicity during the trial. The court also noted that it had repeatedly warned the jury to disregard any information that was not entered into evidence.

The court acknowledged "that some of the few pretrial news reports . . . referred to the case as a shaken baby case"; however, the court found that the evidence showed that the case was not a "shaken baby case" but a "beaten baby case." The court deemed "a beaten baby case" to be "just as reprehensible, if not more so" as "[a] shaken baby case." The court concluded that Contreras failed to show "any impact upon any seated juror because of that error by the media in anticipating what the proof might be at trial."

On appeal, Contreras argues that he is entitled to a new trial due to the prejudicial inaccuracies in the pretrial publicity surrounding the case. He asserts that nearly every major local news source accessible to the jurors carried false information that Contreras was charged with shaking his daughter to death. He contends that he is entitled to a new trial pursuant to Federal Rule of Criminal Procedure 33 because a substantial number of potential jurors indicated during voir dire that they had read or heard accounts of the allegations in the news and that there were too many on the panel who had been exposed to the false information in the news in the days, weeks, and months preceding trial to remove all of the jurors that had been exposed.

"When reviewing whether pretrial publicity violates a criminal defendant's right to a trial by a panel of impartial and indifferent jurors, we engage in a two-tier analysis." *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011) (citations omitted). In the first tier of our analysis, we determine "whether pretrial publicity was so extensive and corrupting that a reviewing court is required to presume unfairness of constitutional magnitude." *Id*. (quotation and citation omitted). "In all other cases, the change-of-venue question turns on the second tier of our analysis, whether the voir dire testimony of those who became trial jurors demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion." *Id*. (quotation and citation omitted).

Here, Contreras has failed to show that pretrial publicity was "so extensive and corrupting" that we should presume unfairness. *See id*. (quotation and citation omitted). The district court found that Contreras failed to make a showing of extensive or misleading publicity during the trial. To be sure, the court acknowledged that some news reports erroneously described the case as a shaken baby case but concluded that the error would not have prejudiced Contreras. The court found that the evidence showed that the case was not a shaken baby case but actually a beaten baby case, which is worse.

Second, Contreras failed to show that the voir dire testimony of any juror demonstrated actual prejudice. Contreras identified no juror who remained on the jury after a challenge for cause based on his or her knowledge of the case.

Finally, the district court repeatedly warned the jury to disregard any information that was not entered into evidence. There is nothing indicating that "the jurors had disregarded the strong instruction and violated the oath to render a verdict in accordance with the evidence in the case." *United States v. Lewis*, 738 F.2d 916, 923 (8th Cir. 1984).

Accordingly, we hold that the district court did not err in denying Contreras's motion for a new trial based on prejudicial pretrial publicity.

## C. *Evidentiary Rulings*

Contreras also raises a number of evidentiary challenges. He asserts that the district court erred in (1) permitting evidence of the spanking incident under Federal Rule of Evidence 404(b); (2) commenting that Contreras's stepson's testimony "might" be allowed as rebuttal evidence; and (3) prohibiting Contreras from exploring some of the victim's mother's and stepfather's "bad habits."

A district court's evidentiary rulings are reviewed for an abuse of discretion and are reversed "only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." *United States v. Elbert*, 561 F.3d 771, 775 (8th Cir. 2009) (quotation and citation omitted).

### 1. *Prior Spanking Incident*

After the district court severed Count 4 from the indictment (the child-abuse count), the government filed notice under Rule 404(b) to attempt to introduce testimony of Contreras's spanking of A.C. on the buttocks in August 2011, which the court permitted.

Contreras argues that the district court erred in admitting evidence of his prior spanking of A.C. under Rule 404(b) because the evidence fails to satisfy the four-part test for admissibility. He asserts that the testimony constituted impermissible propensity evidence intended to show that he is generally a violent person.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But

-13-

evidence may be admitted for another purpose, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We review for an abuse of discretion the district court's admission of evidence under Rule 404(b), "and we will not reverse unless the evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts." *United States v. Williams*, 796 F.3d 951, 958 (8th Cir. 2015) (quotation and citation omitted). "Rule 404(b) is one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination." *Id*. (quotation and citations omitted). In determining whether a district court abused its discretion, we apply a four-part test. *Id*. Under that test, a district court properly admits evidence "under Rule 404(b) if (1) it is relevant to a material issue; (2) it is similar in kind and not overly remote in time to the crime charged; (3) it is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value." *Id*. at 959 (quotation and citations omitted). The fourth requirement derives from Federal Rule of Evidence 403, "which provides in relevant part that '[t]he court may exclude relevant evidence if its probative value is substantially outweighed by [the] danger of . . . unfair prejudice.'" *Id*. (alterations in original) (quoting Fed. R. Evid. 403).

We conclude that the four-part test is satisfied. First, the August 2011 spanking incident was relevant to a material issue. Specifically, the government introduced the evidence to prove absence of mistake and lack of accident in light of Contreras's statement to the FBI that the child had fallen from a chair. Evidence that Contreras had struck the same victim hard enough to offer an apology to her mother just four months prior was relevant to rebut his claim of accident.

Second, the August 2011 spanking incident was similar in kind and close in time to the crime charged. Both the spanking incident and the crime charged involve an assault by Contreras against A.C.—the same victim. And, the spanking incident occurred only four months prior to A.C.'s death. *See, e.g.*, *United States v. Straker*,

567 F. Supp. 2d 174, 178 (D.D.C. 2008), *aff'd*, 800 F.3d 570 (D.C. Cir. 2015) ("Moreover, the other crimes were close in time to the hostage taking charged in this case, *all within four months* of the April 2005 abduction of Balram Maharaj." (emphasis added)).

Third, sufficient evidence supports the occurrence of the August 2011 spanking incident. Both Sine (A.C.'s mother) and Sine's mother (A.C.'s grandmother) testified to observing the handprint on A.C.'s buttocks. Contreras also admitted to Sine that he had spanked A.C. on the buttocks too hard and apologized for doing so. The court admitted a photo into evidence documenting the hand print on A.C.'s buttocks.

Finally, the potential prejudice does not substantially outweigh the evidence's probative value. The district court gave two oral limiting instructions before the jury heard the testimony of Sine and her mother. These instructions "minimiz[ed] the danger of unfair prejudice." *See United States v. Hessman*, 493 F.3d 977, 983 (8th Cir. 2007) ("Further, the district court instructed the jury that the evidence of Hessman's prior convictions should be considered only with respect to the issues of knowledge and intent, thus minimizing the danger of unfair prejudice." (citation omitted)).

Accordingly, we hold that the district court did not abuse its discretion in admitting the August 2011 spanking incident under Rule 404(b).

### 2. *Testimony of A.L. (Contreras's Stepson)*

The government attempted to introduce pursuant to Rule 404(b) the testimony of Contreras's 15-year-old stepson, A.L., concerning Contreras's physical treatment of A.L. in its case-in-chief. The court denied the motion. In denying the government's Rule 404(b) motion and precluding A.L.'s testimony, the court stated:

I'm not going to allow his testimony in the case in chief. But after I hear the defense case, I can best evaluate what the probative value versus the prejudicial effect might be. So it might be that he'll be allowed as a rebuttal witness, depending, but not in the case in chief, because my concern about it being very strong evidence of predisposition. So that's the ruling.

Contreras asserts that while the district court did not permit the government to present evidence in its case-in-chief concerning the allegation that Contreras would hit A.L., his stepson, repeatedly on the head with a closed fist, it ruled that such evidence could be used as rebuttal evidence. Contreras maintains that "[t]his ruling essentially prevented [him] from introducing evidence regarding his *treatment of A.C.* Therefore[,] the court abused its discretion in ruling that it could be admissible as rebuttal evidence." (Emphasis added.)

Contreras's argument fails. First, the district court merely commented on the *possibility* that the evidence concerning A.L. could be used as rebuttal evidence. As the government points out, "[t]he district court could not be expected to announce [or] rule that the evidence could *not* be used in rebuttal *prior* to even hearing the defendant's case-in-chief."

Second, after Contreras presented his case-in-chief, the government again requested that the district court admit A.L.'s testimony as rebuttal evidence. The government argued that Contreras's case-in-chief had opened the door and that the court should therefore permit A.L. to testify. The district court disagreed and did not permit the government to call A.L. as a rebuttal witness.

Finally, Contreras has failed to identify what evidence he was precluded from introducing based on the district court's denial of the government's Rule 404(b) motion concerning A.L.'s testimony.

-16-

### 3. *Evidence Concerning A.C.'s Mother's Habits and Household*

The district court granted motions in limine by the government to exclude any evidence of prior arrests, convictions, police reports, or "character evidence" related to Sine, A.C.'s mother, and her husband, Sam Sine. Contreras argues that this evidence was key to his claim that A.C. could have sustained some or all of her injuries while in the Sines' care. He intended to introduce evidence such as criminal convictions and alcohol abuse. He asserts that such evidence was relevant to the issue of alternative causes of death and admissible as evidence of habit under Federal Rule of Evidence 406.

At trial, Contreras made no offer of proof showing what he planned to introduce about Sine and her husband. Sine's husband did not testify at trial. Sine had no convictions involving dishonesty or any felony convictions. Contreras's attorney claimed Sine "and her husband both have extensive drinking problems, domestic violence problems." He also asserted that Sine has a conviction for neglect and removal of a child but was unable to "recall what the sentence was" and had no copy of the judgment of conviction.

The district court ruled that Contreras's claims that Sine may have some kind of reputation in the community "isn't something that gets to be admitted with regard to her credibility, this mother's credibility, and there's no claim she's the one who was even present when this child sustained [her] injuries." The district court also emphasized a number of times that if Contreras had evidence that Sine or someone else caused the injuries or bruises, that testimony *would* be admitted. The record supports a finding that the district court did not abuse its discretion in declining to admit this evidence.

### D. *Competency*

Contreras's trial was completed on August 1, 2013. Neither before nor during trial did Contreras exhibit any unusual behavior to his lawyer or the court. Contreras

also exhibited no unusual behavior when he was interviewed by his probation officer on August 20, 2013. But on November 19, 2013—after Contreras was found guilty of Counts 1 and 3 but prior to sentencing—Contreras moved for a competency evaluation. The district court held a hearing on Contreras's motion, and the court questioned Contreras. The court found that "[a]t times, Defendant completely failed to respond to the Court's questions." The court noted that Contreras's "probation officer testified that Defendant's personality was dramatically different and his physical appearance had changed since his August 20 interview of Defendant." Specifically Contreras "had lost weight, appeared much thinner, and had a much different affect at the November hearing as compared to the meeting on August 20, 2013." The court concluded that it was "in need of further and specific information to determine if Defendant presently is suffering from a mental disease or defect." As a result, the court "request[ed] a comprehensive evaluation of Defendant to determine his current psychological condition" and granted Contreras's motion for a mental evaluation. The court ordered that Dr. David Bean, M.D., conduct the psychiatric evaluation.

Dr. Bean examined Contreras once for approximately 35 minutes and performed no tests. He later opined in a report that Contreras may have some mental problems based on Contreras's refusal to talk to Dr. Bean during the session. Dr. Bean found Contreras incompetent to be sentenced.

After reviewing Dr. Bean's report, the district court entered an order placing Contreras in an appropriate facility for up to four months to determine whether he would likely regain capacity in "the foreseeable future." Contreras was sent to a federal medical center for a two-month examination. At the completion of that examination, the Bureau of Prisons psychiatrist prepared a report finding Contreras competent. The "Opinion on Competency" portion of the report concluded that Contreras "did not appear to suffer from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or

to properly assist in his defense." In fact, the examining physician testified that Contreras likely was malingering and that there was insufficient data to conclude that he lacked competence to proceed with sentencing.

"[A] defendant must be competent at all stages of the prosecution, including sentencing." *United States v. Casteel*, 717 F.3d 635, 641 (8th Cir. 2013) (alteration in original) (quotation and citation omitted). "Determining whether a defendant is competent . . . is committed to the discretion of the district court." *United States v. Whittington*, 586 F.3d 613, 617 (8th Cir. 2009) (quotation and citation omitted). We will affirm the district court's factual finding as to competency "unless [it is] clearly arbitrary or unwarranted, or clearly erroneous." *Id.* (quotations and citations omitted). Based on the Bureau of Prisons psychiatrist's medical opinion, we hold that the district court did not clearly err in finding Contreras competent.

### E. *Sentence*

Finally, Contreras argues that his sentence violates the Eighth Amendment and is otherwise substantively unreasonable.

### 1. *Eighth Amendment*

Contreras argues that the mandatory minimum sentence provided in 18 U.S.C. § 3559(f)(1) is unconstitutional as applied to him. According to Contreras, the government alleged at trial that he struck A.C. in reaction to the stress of being late for work; in doing so, Contreras claims that the government was describing a "heat of passion" assault. He maintains that this conduct—while serious—"is not so much more serious than the homicides referenced [in his brief] as to require a mandatory minimum sentence that is twice what one would expect in other circumstances."

"'[A] sentence within statutory limits is generally not subject to review under the Eighth Amendment.'" *United States v. Rodriguez–Ramos*, 663 F.3d 356, 366 (8th Cir. 2011) (quoting *United States v. Murphy*, 899 F.2d 714, 719 (8th Cir. 1990)); *see*

*also United States v. Collins*, 340 F.3d 672, 679 (8th Cir. 2003) ("It is well settled that a sentence within the range provided by statute is generally not reviewable by an appellate court." (citation omitted)). In fact, we have "never held a sentence within the statutory range to violate the Eighth Amendment." *United States v. Vanhorn*, 740 F.3d 1166, 1170 (8th Cir. 2014) (citing *United States v. Neadeau*, 639 F.3d 453, 456 (8th Cir. 2011)). We decline to deviate from this precedent in the present case.

## 2. *Substantive Reasonableness*

Contreras also argues that he should have received a downward variance from the Guidelines range because (1) he maintains his innocence; (2) sentencing him to 30 years in prison does not constitute just punishment or deter future conduct; (3) he has raised six children; (4) he has a nonviolent past; (5) he has had minimal contact with the criminal justice system; and (6) there is no need to provide him with additional training, education, or medical care.

Contreras fails to recognize that he was sentenced to a statutorily-prescribed mandatory minimum sentence of 30 years imprisonment, not pursuant to the Guidelines. *See* 18 U.S.C. § 3559(f)(1) ("A person who is convicted of a Federal offense that is a crime of violence against the person of an individual who has not attained the age of 18 years shall, unless a greater mandatory minimum sentence of imprisonment is otherwise provided by law and regardless of any maximum term of imprisonment otherwise provided for the offense—(1) if the crime of violence is murder, be imprisoned for life or for any term of years not less than 30, except that such person shall be punished by death or life imprisonment if the circumstances satisfy any of subparagraphs (A) through (D) of section 3591(a)(2) of this title . . . ."). As discussed *supra*, this sentence did not violate his Eighth Amendment rights.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____